STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**23-218**

**STATE OF LOUISIANA**

**VERSUS**

**DONALD ALAN CROOKS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 2020-455
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Sharon Darville Wilson, Judges.

**AFFIRMED IN PART; VACATED IN PART;**
**AND REMANDED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 6547**
**Lake Charles, LA 70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Donald Alan Crooks**

**James P. Lemoine**
**District Attorney**
**Jimmy D. White**
**Assistant District Attorney**
**Thirty-Fifth Judicial District**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**KYZAR, Judge.**

Defendant, Donald Alan Cooks, appeals from his convictions and sentences for three counts of sexual battery, one count of malfeasance in office, and one count of filing or maintaining false public records. For the reasons set forth herein, we affirm the convictions as to all counts and the sentences as to the convictions for the three counts of sexual battery, and we vacate and remand to the trial court for resentencing on the counts of malfeasance in office and filing or maintaining false public records.

## FACTS AND PROCEDURAL HISTORY

Defendant was charged by a bill of information with committing three counts of sexual battery on the same victim, J.G.W., in violation of La.R.S. 14:43.1, all occurring between November 21, 2019 and March 30, 2020.[1] Within the same bill of information, he was also charged with one count of filing or maintaining false public records, in violation of La.R.S. 14:133, also occurring between November 21, 2019 and March 30, 2020, and one count of malfeasance in office in violation of La.R.S. 14:134.[2] Defendant was tried before a six-person jury beginning on June 20, 2022, and concluding on June 23, 2022, whereupon he was convicted as charged by unanimous jury verdicts.

J.G.W. was the first to testify on behalf of the State at trial. She was employed as a corrections officer for the Winn Parish Corrections Office at the time of trial but was previously employed as a patrol officer for the Village of Creola (Creola). She began working at that job November 21, 2019, and continued working until she was discharged March 30 the following year. She worked directly under the supervision

---

[1] Pursuant to La.R.S. 46:1844(W), the victims' initials are used to protect their identities.

[2] The bill of information containing the final five counts on which Defendant was tried was the third amending and supplemental bill of information.

of Defendant, who was Creola's Chief of Police. She described her job duties as protecting and serving the community, and traffic enforcement, which included writing traffic citations. At the time she was hired, J.G.W. was not a trained law enforcement officer, and at least through December 2019, she was not certified to operate a traffic radar unit used for the issuance of traffic citations by law enforcement officials. As of the time of trial, J.G.W. was still not a POST-certified law enforcement officer.[3]

During the month of December 2019, Defendant provided J.G.W. with blank traffic citation forms used to issue traffic citations to violators, which he pre-signed with his name, as Chief of Police, swearing to the legal basis of the citation, an event which had not yet occurred. She testified that Defendant told her to use the pre-signed ticket forms to go out and write traffic tickets while he was away. During the trial, J.G.W. identified eleven such citations issued to various motorists in December 2019, that were pre-signed by Defendant but not witnessed by him. All eleven tickets charged at least one count of speeding. She testified that although she utilized the radar machine in identifying violators to whom the tickets were issued, she was not certified to use the machine and was not certified until three months later while still working for Creola.[4] Defendant was not present to observe any of the violations as he was away from work at a conference.

---

[3] "Louisiana Peace Officer Standards and Training Council (POST). POST was established by Act 397 of 1976, as amended, to develop training standards for peace officers in the State of Louisiana[]" with the "goal of ensuring that the citizens of Louisiana are provided with police services of the highest quality." Louisiana Commission on Law Enforcement and Administration of Criminal Justice. https://lcle.la.gov/programs/post/(last visited on October 11, 2023).

[4] On cross-examination, Defendant presented a document to J.G.W. purporting to show that she was certified by him in the operation of the traffic radar unit on December 14, 2019, though she testified she did not recall being certified then. However, only three of the tickets were written on or after December 14.

2

While J.G.W.'s working relationship started normally with Defendant, it deteriorated when she began receiving inappropriate text messages from him. He initially sent her a message asking her to attend a conference of Chiefs of Police in Baton Rouge with him and to share a single room with one king-sized bed. J.G.W., who was married with four children at the time, testified that she never encouraged Defendant in any way, particularly in any romantic or sexual way during her employment nor did she indicate wanting to have any type of relationship with him in that manner. After this and other text messages, Defendant's advances became physical.

The first such incident occurred towards the end of December 2019, when the two were passing in the hallway of the office.[5] Defendant, according to J.G.W., made a comment about her butt looking big in the pants she was wearing, then as she walked by, he grazed his hand across her buttocks. She testified that the act was intentional. She testified that she was stunned by Defendant's actions and told him, "Stop, don't do that." This incident occurred shortly after she had received a text message from Defendant on December 22, 2019, wherein, after learning that she was alone at the office participation in on-line sexual harassment awareness training, he told her that "he needed be there so he [could] sexually harass" her.

The next incident occurred in February of 2020, when J.G.W. was smoking a cigarette outside the office and was locking the office door behind her. She testified that she thought defendant had already gone from the office but as she was locking the door, Defendant came up behind her, grabbed her with one hand by her ponytail, pushed her over a railing, and with his other hand, "he went above, not under my

---

[5] This incident did not form the basis for the counts in the bill of information as it was arguably a misdemeanor grade of sexual battery pursuant to La.R.S. 14:43.1.1. However, this testimony was elicited without objection from Defendant.

3

clothes, but on top of my clothes, . . . and touched my top part of my vagina."[6] She stated that he also "thrusted [sic] his genitals to my buttocks." J.G.W. testified that she in no way consented to Defendant's actions that day and that when this incident occurred, she told him, "Stop, don't do this. Leave me alone." On hearing this, Defendant just "laughed it off and left."

J.G.W. testified that the next incident occurred when she was at the office mailbox, inside the office where each officer had a box. As she reached in hers to get her mail, Defendant "came up behind me, and with one hand grabbed my breast, and with the other hand thrusted [sic] me towards him." She stated that "[h]is other hand was very low on the top part of my vagina." On cross examination, J.G.W. explained to the jury exactly where Defendant touched her, and when asked if Defendant "reaches around and grabs your genitals with the other hand[,]" she replied, "Just the top, yes." She testified as to her reaction stating, "get off me, and I went straight out the door and got in my unit, and left."

J.G.W. testified as to another occasion where she had gone to the bathroom: "whenever I came out the bathroom door, and I was . . . he was standing right there." This occurred approximately a week before she was laid off from her job at the end of March 2020. She testified that Defendant "walked and pushed me into the bathroom, and luckily the door did not close all the way because I was trying to get around him to get out of the bathroom door." He then "grabbed my shirt like this, and he took his hands and he slipped it inside my pants[]" and touched the "top part of my vagina." She stated that as a result of this incident, she "got more aggressive with him, and I told him that would be the last time he would ever put his hands on me." She elbowed him in his chest and shoulder area to extricate herself and get out

---

[6] During this portion of the transcript, the court reporter indicated that J.G.W. was crying while giving her testimony.

4

of the bathroom. She again testified that she in no way consented to Defendant's actions and that she felt violated as a result. She left work and went home. Afterwards, she contacted Creola's town clerk, and the two of them reported that incident and the others to Creola's mayor, Danny Moore. She testified that Creola's city attorney, Brian Mosely, became involved and sent a letter to the sheriff, but she was then terminated from her job in March 2020. She testified that Defendant told her she was being let go because of the effects of the coronavirus epidemic that were ongoing at the time.

J.G.W. also testified that during the course of the incidents, she contacted a friend and confidant, Detective Ryan James of the Grant Parish Sheriff's Department, not to file a formal complaint but for professional advice. She stated that she was the only one in her household working at the time and desperately needed her job. She testified that Detective James advised her to keep a record of the inappropriate behavior and to begin searching for another job.

Mr. Mosely testified that he is an assistant district attorney in Rapides Parish and Creola's city attorney. He stated that his job responsibilities as such are to advise the mayor and town council on legal questions and to serve as the prosecutor in municipal court for Creola. He knows Defendant as the Chief of Police of Creola.[7] He testified concerning the traffic tickets forming the basis for the filing or maintaining false public documents charge against Defendant, stating the importance of the signature of the complaining officer in the following colloquy:

A.  [A] traffic ticket ... it's kind of ... a form that ... police officers use for traffic patrol, that they observe someone committing some type of traffic offense then they have the option of issuing a ticket to the [offense].

Q.  Okay. And is uh, is there anything, any kind of uh, particular reason they use a particular type of form?

---

[7] The Oath of Office signed by Chief Crooks was introduced into evidence.

5

A. Well so it will be uh, a so it would be uniform.

Q. Okay.

A. So it will be the same uh, you don't want any discrepancies um, you know we want to make sure uh, certainly for the purpose of the municipal court that um, everything is being run legitimately.

Q. Okay, and so uh, is it fair to say those - - those complaints are described as an affidavit?

A. Yes, it's an affidavit um, and it can be used to institute prosecution uh, just like a Bill of Information which I would--if I were to have a file come to me as a prosecutor and uh, decide to charge somebody with a crime, then I would do so in what's called a Bill of Information.

Q. Right.

A. And uh, it can be that charging instrument can also be in the form of an affidavit such as a traffic ticket.

Q. Okay, and is that allowed on, I guess lessor types of uh, crime or lessor types of offenses, ...

A. Right.

Q. ... is that correct?

A. Right, right, typically your um, what we call the Title 32 offenses which is where you find your traffic offenses and some of the minor misdemeanors and felonies can be charged that way as well.

Q. I see. And so um, under Title 32 there-- is there any importance of the form being an affidavit form? Is there reason [sic] why a ticket as a charging instrument is in affidavit form?

A. Um, yes, because um, if it is in the affidavit form then the - - the officer that is issuing the citation is um, saying under oath that this is what happened.

After Mr. Mosely learned of the discrepancies with Defendant's signatures on the tickets, he dismissed those tickets that had not been paid, explaining that he did so for a number of reasons, including the need to maintain the integrity of the court, because the tickets not signed under oath were not proper charging instruments, and

6

because Defendant's failure to comply was in effect untruthful statements to the court.

Mr. Mosely was also contacted by Mr. Moore concerning the sexual battery allegation against Defendant by J.G.W. As a result of this information, he turned the potential criminal investigation over to the Grant Parish Sheriff's Department via a written letter to the sheriff.[8]

Holly Brashear, a contractor for the United States Marshall Service at the time of trial, testified that she had previously been employed as Creola's town clerk. Her job duties as clerk included intaking tickets for Creola's patrol officers, signing off on them, and putting them into the system. In addition, she was responsible for taking minutes from meetings and sending them for publication, receiving tax collections, and paying Creola's bills. She began working in that capacity in October 2019, and Defendant was the Chief of Police at the time. When asked on direct examination if she had seen or witnessed any kind of inappropriate actions between Defendant and J.G.W. during her employment, she replied, "Yes, sir."

After testifying about overhearing several inappropriate sexual comments made by Defendant towards J.G.W., Ms. Brashear stated:

> Uh, there was one incident of she was getting out of the cop car, uh, she just got back to the office. Martin Shaw just received Blue, getting ready for him to go to canine training, and she was trying to get out of the car, and Don had opened the door for her, and she asked him to move, and he would not move. She went to get out of the cop car, when she did, he grabbed this side and went across right on her boobs, like you could see them physically move.[9]

---

[8] The letter was introduced as an exhibit for the State.

[9] This incident did not form the basis of the felony sexual battery charges but was testified to without objection from Defendant.

7

She testified that J.G.W. reacted to this incident by telling Defendant to "please f...... stop[,]" in reaction to which Defendant simply "joked it off, and said I was just picking with you."

Ms. Brashear recalled another incident:

> They were leaving one day um, he went to lock the office up, and she said hold on, wait a minute, I forgot something and when she went to grab he was holding the door open with his left hand like this, and she went under his arm, and he grabbed her butt like firmly. She turned around and said, don't do that.[10]

Ms. Brashear recounted an incident directly involving her being inappropriately touched by Defendant:

> Um, I came in, it was November, I came in, my husband was in the hospital, my husband suffers with Ulcerative Colitis and a liver disease that can kill him. He was in the hospital, I came here, I was crying and upset. I asked him if he had coffee ready, and he asked what was wrong, and he was coming around the desk to get some more coffee. He asked me, what was wrong, and I told him that, you know, Kevin was in the hospital, and everything else, and he gave me a hug, and said well it's going to be all right, girl, and when he went to let go, he slid his hand down my back and grabbed my butt, and pulled me in, and I pushed him away immediately and said you don't f...... touch me like that.

Ms. Brashear also recalled an incident in March 2020, wherein she observed J.G.W. hastily departing the police station, in uniform. "She was very mad, upset, her face was really red, and she was crying, her eyeliner was running." Ms. Brashear testified that it was very apparent to her that something had happened to J.G.W. that had upset her. While she testified that J.G.W. told her what had happened leading to her leaving the office in this state, without reciting the conversation in her testimony, she responded that J.G.W.'s reaction that day was consistent with her allegations of inappropriate conduct by Defendant. When asked later in her direct examination if Defendant ever told her during any conversation that he wished to

---

[10] This incident did not form the basis of the felony sexual battery charges but was testified to without objection from Defendant.

8

have a romantic relationship or any kind of physical relationship with J.G.W., she replied, "Yes, sir." She recalled that Defendant stated to her that he invited J.G.W. to go to the Chief's Conference, and that there was only one bed and one room for them to stay in together.

When asked if she was familiar with the tickets that had been pre-signed by Defendant, Ms. Brashear stated, "[Defendant] had pre-signed the tickets, the book of tickets before he went out of town because Ms. Goss, Julie Goss and [J.G.W.] were not radar certified yet so therefore, they were not able to write tickets." When asked if she had any reservations about notarizing the tickets Defendant had pre-signed when they were returned fully filled out, she stated, "I did at first because I went through - - I went ahead and notarized them, but as I went through, I realized the dates and the dates didn't add up to when [Defendant] was in town." She testified that this caused her concern, and as a result, she contacted the mayor, who advised her to contact Mr. Mosely, which she did.

Detective James testified that he had personally known J.G.W. since 1999, and that their relationship was of a professional nature. She would consult with him occasionally if she had questions. In February or March 2020, she contacted him for advice because "[s]he had been having some issues uh, what I would describe as harassment or non-ethical behavior with her boss." He testified that he gave her advice as to how to handle the situation. He stated that at the time, J.G.W. did not want to file formal criminal charges. Detective James "told her if she wasn't going to file a criminal complaint that she needed to either document it, what, you know, what further actions or contact the State Police because he is an elected official."

Detective James was also asked on direct examination if he had issued traffic citations in his past law enforcement experience, and he replied affirmatively. He testified that he was, in fact, certified in the operation of radar units used for traffic

9

enforcement. He went on to describe the importance of the officer who observed the violation being the one to sign the citation under oath. He stated that the citation is made under oath and that "[w]hen you sign the affiant line you're stating that you issued that citation, and you're proving as far as when it goes to court that you're the one who issued that ticket."

Bradley Suddeth, Grant Parish Sheriff's Department's former Chief Detective, testified. He had retired from his position shortly before the start of the trial. During his employment, he was charged with investigating the allegations against Defendant after meeting with Sheriff Steve McCain, who provided him with a letter written by Mr. Mosely, outlining his knowledge of the inappropriate sexual advances by Defendant towards Creola's employees. As a result of his investigation, he ultimately prepared an arrest warrant charging Defendant.

Defendant called William Mattix, the Assistant Chief of Police for Creola, to testify. He was asked about the propriety of issuing pre-signed traffic tickets by Defendant's counsel, as follows:

> Q.　I present the witness with the uh, tickets that has been previously introduced into evidence. I'm asking you to review those. Uh, can you tell who issued those tickets?
>
> A.　Well it appears that Chief Crooks, and [J.G.W.] would have issued those tickets.
>
> Q.　And why do you say that?
>
> A.　Because Chief Crooks is the signing officer, and then [J.G.W.] initial's [are] above his number.
>
> Q.　Okay, uh, was that a common practice in the Town of Creola during training for the ticket to be signed that way?
>
> A.　Yes, sir, I mean, it's uh, that - - I don't see nothing [sic] wrong with that.
>
> Q.　In other words the initials of the person issuing the ticket do appear on the ticket?

10

A. Correct.

Q. And where do those initials appear?

A. Uh, the Chief was getting her apparently to put them above his name, his uh, CR number, his data number.

Q. Okay, so on all these tickets uh, an initial is placed to indicate the name of the officer?

A. Well this just tells me that two (2) officers was [sic] there with the - - on the stop and issued the violation.

However, on cross-examination, he was questioned about the propriety of the signing officer having not witnessed the actual violation:

Q. Right, but what if you wanted that officer to work while you weren't there?

A. Then they could work.

Q. I understand, but what if they can't run radar because they're not certified, but you want them on the road because you wanted the money to come in. Would you then decide to put your name on the affiant line, and - - and make up a false document about you being the one that observed the conduct that caused that ticket? Would you do that?

A. No, sir, I wouldn't do that.

Q. . . . Because it's - - to put your name down as the affiant that you observed the conduct, and if you didn't observe the conduct then basically you're swearing to something under oath that you didn't do. Would you agree to that?

A. Yes, sir, I would.

Q. Okay. Is an oath important to you?

A. Yes, sir.

Q. All right, would swearing to something under oath if it wasn't true, would that be important to you?

A. Yes.

Q. Would that be in fact a felony?

A. It could be.

11

Assistant Chief Maddix was questioned on cross examination about whether he knew that the initials "JW" written on the thirteen citations were actually placed there by Ms. Brashear, and he stated he assumed they were those of J.G.W. He further explained the process of filing the original traffic ticket with the clerk, that the tickets were part of a set that had four duplicates, and that at least one duplicate was maintained as part of the police department records, and another duplicate was maintained by the issuing officer.[11]

At the conclusion of the trial, Defendant was found guilty of all counts. On November 3, 2022, Defendant was sentenced to eighteen months at hard labor on each of the three counts of sexual battery, the sentences to run concurrently with each other and consecutively with the sentences for the sexual battery convictions. In connection with the sexual battery convictions, Defendant was ordered to register as a sex offender for a period of fifteen years. For the conviction for filing false public records, Defendant was sentenced to two years at hard labor, which sentence was suspended, and Defendant was ordered to be placed on supervised probation for two years, beginning at his release from incarceration. In addition, he was ordered to pay a fine of $2,500.00 and to pay restitution to the persons who were wrongly cited for traffic violations within Creola during the dates of the offense. Finally, Defendant was sentenced to two years at hard labor for the malfeasance in office conviction, which sentence was also suspended, with Defendant being placed on supervised probation for a period of two years following his release from incarceration. The latter two sentences were ordered to run concurrently.

---

[11] Defendant thereafter called other witnesses, none of which testified to any direct knowledge of the charges or the underlying basis thereof.

12

Following his conviction, Defendant filed a motion for new trial, which was considered by the trial court on October 13, 2022, and denied. A motion to reconsider sentence was filed on November 30, 2022, and denied the same day. This appeal followed, wherein Defendant asserts the following assignments of error:

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[,] standard, was insufficient to prove beyond a reasonable doubt that Donald Alan Crooks committed any of the three felony sexual batteries as set forth in counts one through three of the Third Amended Bill of Information.

2. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[,] standard, was insufficient to prove beyond a reasonable doubt that Donald Alan Crooks committed the offense of filing or maintaining false public records.

3. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[,] standard, was insufficient to prove beyond a reasonable doubt that Donald Alan Crooks committed malfeasance in office.

4. The sentences imposed on the three counts of sexual battery are a violation of the Eighth Amendment of the Constitution of the United States and La. Const. Art. I, § 20, as they are nothing more than cruel and unusual punishment and, thus, excessive as Donald Crooks' health has severely deteriorated since his arrest, limiting his ability to walk or communicate with others and requiring substantial assistance.

5. The trial court committed manifest error when it denied the defense's motion in limine and permitted the State to offer testimony concerning another alleged improper touching which, if proven, would have been a misdemeanor grade offense, as the alleged bad act was irrelevant and highly prejudicial to Donald Crooks.

6. Counsel for Donald Crooks failed to perform to the standard required by the Sixth Amendment to the United States Constitution when he failed to seek the severance of the three sexual battery counts from the remaining two counts and when he failed to seek to quash count five of the Third Amended Bill of Information.

13

7.     A double jeopardy violation occurred when Donald Crooks was convicted of malfeasance in office and the underlying offenses used to prove the malfeasance allegation.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

The trial court sentenced Defendant on the filing false public records conviction to two years at hard labor, suspended, and it placed him on two years of supervised probation. The probation was subject to the general conditions of La.Code Crim.P. art. 895, as well as special conditions including, but not limited to, a fine of $2,500.00 and court costs. Additionally, Defendant was ordered to pay restitution to the drivers who received tickets that were pre-signed by Defendant and "not refunded by the Village." Thereafter, the trial court stated:

> The Court will allow Mr. Crooks to and proba - - and the State an opportunity to have a restitution hearing if the Court needs to determine the amount of that restitution as well. The Court will set the time frame for the payment of any restitution at that hearing if it is not agreed upon by the various uh, the Defendant and the State.

For the malfeasance conviction, Defendant was sentenced to serve two years at hard labor, suspended. He was placed on two years of supervised probation with all the conditions imposed for filing false public records also being imposed for the charge of malfeasance in office. The trial court added, "the two (2) year sentences and the probation are concurrent with each other."

We find that the trial court erred in failing to set the amount of restitution it ordered to be paid to the drivers "who received tickets that were pre-signed by [Defendant] that were not refunded by the Village."

In *State v. Alexander*, 03-167, p. 3 (La.App. 3 Cir. 9/10/03), 854 So.2d 456, 458–59, *writ denied*, 03-2822 (La. 3/12/04), 869 So.2d 815, this court stated:

14

As a condition of probation, the Defendant was ordered to pay a monthly supervision fee and to make restitution to the city of Jeanerette for the expenses incurred as a result of the crime, in an amount to be determined by the Defendant and his probation officer. The judge stated he would hold a hearing and determine the amount of restitution only if the Defendant and his probation officer did not agree on the amount to be paid.

The first error patent concerns the failure of the trial judge to establish the amount of restitution to be paid by the Defendant. This resulted in an illegal sentence. In *State v. Dauzat*, 590 So.2d 768, 775 (La.App. 3 Cir.1991), *writ denied*, 598 So.2d 355 (La.1992), this court stated:

> When a sentencing judge orders a defendant to make restitution to the victim, both La.C.Cr.P. arts. 895(A)(7) and 895.1 require the court, and not the probation officer, to determine the amount of restitution. Because the court failed to determine the amount of restitution owed as a special condition of probation, the defendant's sentence is illegal. *State v. Hardy*, 432 So.2d 865 (La.1983). *State v. Rogers*, 517 So.2d 428 (La.App. 1st Cir.1987).

This error cannot be corrected by an appellate court. Therefore, defendant's sentence must be reversed with the case to be remanded for resentencing. Upon resentencing, the judge must determine the amount of money taken by the defendant which was not covered by insurance. Restitution for this loss may be ordered pursuant to either La.C.Cr.P. arts. 895 or 895.1.

Therefore, the Defendant's sentence is vacated and the case remanded for resentencing.

In *State v. Fussell*, 06-324 (La.App. 3 Cir. 9/27/06), 941 So.2d 109, *rev'd on other grounds*, 06-2595 (La. 1/16/08), 974 So.2d 1223, restitution was imposed pursuant to La.Code Crim.P. art. 883.2 as part of the defendant's principal sentence. This court found the trial court's failure to set the amount of restitution rendered the defendant's sentence indeterminate. In sentencing the defendant, the trial court stated:

> I'm also gonna [sic] order you to pay all restitution involved with respect to—if there is any—I order you to pay for any and all medical counseling and health expenses incurred by the victim or her family, as a consequence of your conviction for these offenses. That's

15

also gonna [sic] be—it's an indetermined amount, it's just gonna [sic] be generally made in the judgment. I don't know what it's gonna [sic] be. I don't even know if the State's gonna [sic] make an application for that.

. . . .

And I've already ordered you to pay for any and all medical counseling or other health expenses incurred by the victim or her family as a consequence of your commission of those particular offenses in that case.

*Id.* at 139.

This court vacated the defendant's sentences and remanded for resentencing, noting that if restitution was imposed by the trial court, it must specify the amount. The supreme court agreed with this portion of this court's ruling, stating:

We agree with the Third Circuit Court of Appeal that, due to a nonspecific restitution order, the sentences imposed upon Defendant by the trial court were indeterminate and, thus, invalid. *See* La. C.Cr.P. art. 879 (stating that "[i]f a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence"); La.C.Cr.P. art. 883.2. Accordingly, this case must now be remanded for resentencing on all convicted counts.

*Fussell,* 974 So.2d at 1238 (alteration in original) (footnote omitted).

Accordingly, Defendant's sentences for filing false public records and malfeasance in office are vacated and the case is remanded for resentencing. If restitution is ordered following such hearing the trial court is to comply with the requirements of La.Code Crim.P. art. 875.1 before doing so.[12]

---

[12] Effective August 1, 2022, prior to Defendant's November 3, 2022 sentencing, La.Code Crim.P. art. 875.1 requires the sentencing court to determine at a hearing whether payment in full of the aggregate amount of all financial obligations imposed upon the defendant including fines, costs, and restitution would cause substantial financial hardship to the defendant or his dependents, and gives the court the discretion to waive all or a portion of such obligations on compliance with its provisions thereof.

16

## DISCUSSION

### DOUBLE JEOPARDY

In assignment of error number seven, Defendant claims that a double jeopardy violation occurred when he was convicted of malfeasance in office and the underlying offenses used to prove the malfeasance allegation, including sexual battery and/or filing or maintaining false public records. We address this assignment of error first as it raises a jurisdictional issue. *See, e.g., State v. Toby*, 22-386, (La.App. 3 Cir. 3/8/23), 358 So.3d 289, n.1 (citing *State v. Sarrabea*, 12-1013 (La.App. 3 Cir. 5/1/13), 157 So.3d 1, *aff'd*, 13-1271 (La. 10/15/13), 126 So.3d 453).

While Defendant failed to file a motion to quash the bill of information based on double jeopardy in the trial court, the issue is properly before this court as double jeopardy may be raised at any time, including for the first time on appeal. *State v. Austin*, 04-993, (La.App. 5 Cir. 3/1/05), 900 So.2d 867, *writ denied*, 05-830 (La. 11/28/05), 916 So.2d 143; *State v. Jenkins*, 45,873, (La.App. 2 Cir. 1/26/11), 57 So.3d 405.

The Fifth Amendment to the Constitution of the United States provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Similarly, in Louisiana, "No person shall be twice placed in jeopardy for the same offense, except on his application for a new trial, when a mistrial is declared, or when a motion in arrest of judgment is sustained." La.Const. art. 1, § 15.

The Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, (1932), pronounced the test for determining whether the double jeopardy clause has been implicated, by examining the elements of the offenses:

> Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

17

determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Gavieres v. United States*, 220 U. S. 338, 342, 31 S. Ct. 421, 55 L. Ed. 489, and authorities cited. In that case this court quoted from and adopted the language of the Supreme Court of Massachusetts in *Morey v. Commonwealth*, 108 Mass. 433: "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

The basis of Defendant's double jeopardy argument to this court is that his convictions were based upon the same evidence. He contends that the State relied on the underlying evidence proving the sexual batteries and filing false public records as the evidence proving the malfeasance in office charge. By analogy, Defendant asserts that "[s]imilar to the felony murder doctrine, when the underlying felony or intentional misdemeanor must be proven to establish a necessary element of the offense, a defendant cannot be convicted of both." As such, Defendant asserts his conviction and sentence for malfeasance in office should be vacated based on double jeopardy as it is the lesser of the offenses. On the other hand, the State emphasizes that the supreme court dispensed with the "same evidence test" in analyzing double jeopardy claims, citing *State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27.

In *Frank*, our supreme court made "clear that the protections against double jeopardy mandated by the federal constitution, as restated in this state's constitution, fall within the analytical framework set forth in *Blockburger*, and Louisiana courts need only apply that framework in analyzing questions of double jeopardy." *Frank*, 234 So.3d at 33–34. There, the supreme court reversed a decision by this court wherein we had reversed the defendant's conviction for attempted felony carnal knowledge of a juvenile which was also the underlying basis for his conviction for malfeasance in office. *See State v. Frank*, 15-893 (La. App. 3 Cir. 5/25/16), 192

18

So.3d 888. Abrogating the "same evidence test" formerly applied by Louisiana courts in analyzing double jeopardy challenges, the supreme court found that no double jeopardy violation occurred in that case and reinstated the defendant's conviction and sentence for attempted felony carnal knowledge of a juvenile along with his conviction for malfeasance in office "[b]ecause no double jeopardy violation is apparent here under *Blockburger*[.]" *Frank*, 234 So.3d at 34.

The same analysis applied in *Frank* is equally applicable here, as is the result. Malfeasance in office requires proof of different and additional elements than the underlying offenses of sexual battery and filing or maintaining false public records. For example, malfeasance in office requires proof that the offender was a public officer. No such showing is necessary to find Defendant guilty of sexual battery, nor is this element necessary to prove filing or maintaining false public records. Accordingly, we find that no double jeopardy violation occurred here.

## SUFFICIENCY OF THE EVIDENCE

In his first three assignments of error, Defendant argues that the evidence introduced at the trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), standard, is insufficient to prove beyond a reasonable doubt that he committed any of the three felony sexual batteries or that he committed the offense of filing or maintaining false public records and malfeasance in office. Our analysis for insufficiency of evidence claims on appeal is well settled and was set forth by this court in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d

19

559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

We will address each of the first three assignments of error as to the particular convictions separately.

*Three Counts of Sexual Battery*

In assignment of error number one, Defendant maintains that the evidence introduced at the trial is insufficient to prove beyond a reasonable doubt that he committed any of the three felony sexual batteries on J.G.W. As is relevant here, sexual battery is defined as "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, when the offender acts without the consent of the victim." La.R.S. 14:43.1(A)(1). "Whoever commits the crime of sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than ten years." La.R.S. 14:43.1(C)(1).

Sexual battery requires the existence of general intent. *State v. Bourque*, 09-1092 (La.App. 3 Cir. 4/7/10), 33 So.3d 1092. "General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La.R.S. 14:10(2).

20

In his brief, Defendant argues that the evidence was insufficient because J.G.W.'s allegations that he committed sexual batteries on unspecified dates were not detailed and were uncorroborated by other evidence. Referencing the text messages admitted into evidence, he claims the messages reveal that the relationship with J.G.W. "went beyond an employee/employer" but do not reveal "any animosity J.G.W. had toward [him]" resulting from any inappropriate behavior. He attempts to cast doubt upon the allegations by observing that J.G.W. received a "Positive Discipline System Coaching Form" by Defendant on February 7, 2020, which contained three disciplinary incidents regarding her job performance: a traffic stop where she failed to identify the driver, failed to request the registration and insurance, and allowed the driver to leave with a verbal warning; an improper cuffing of an individual; and an improper usage of her police car. Additionally, Defendant notes that J.G.W. did not make a report until the week after she was laid off from the Creola Police Department (CPD). Defendant concludes that "[t]here was strong motivation for J.G.W. to fabricate allegations against [Defendant], who questioned her integrity and laid her off."

It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983). Similarly, though Defendant argues a lack of independent, direct evidence supporting J.G.W.'s testimony, "Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Leyva-Martinez*, 07-1255, pp. 6–7 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, 282, *writ denied*, 08-1200 (La. 1/30/09), 999 So.2d 747. Such testimony is sufficient even when there is no medical, scientific, or physical evidence. *State v.*

21

*Rives*, 407 So.2d 1195 (La.1981); *State v. Thomas*, 30,490 (La.App. 2 Cir. 04/08/98), 711 So.2d 808, *writ denied*, 99-331 (La. 07/02/99), 747 So.2d 8.

In this instance, there was sufficient direct evidence from which the jury could have found Defendant guilty of all three sexual batteries. J.G.W. testified about three separate incidents where Defendant inappropriately touched her. J.G.W. testified that while she was outside of the CPD on the porch one day, Defendant came up behind her and grabbed her by the ponytail, pushed her on the railing, and touched her vagina with his hand on top of her clothes. Defendant thrust his genitals into her buttocks as he touched her vagina. When she was in the mailroom at the CPD another day, Defendant came up behind her, grabbed her breast with one hand, and touched her vagina with his other hand. J.G.W. testified that while she was leaving the bathroom at the CPD, Defendant forced his way into the bathroom and reached his hand inside her pants to touch her vagina. J.G.W. stated that all the touches were non-consensual and were at the top of her vagina with two of the touches occurring outside of her clothing and one inside her clothing. Neither penetration nor disrobing are elements of sexual battery. *State v. Guidry*, 95-254 (La.App. 3 Cir. 11/2/95), 664 So.2d 698.

J.G.W.'s unequivocal testimony that Defendant touched her vagina on three occasions establishes the crimes of sexual battery. Because credibility determinations are the sole province of the factfinder, the jury was free to accept J.G.W.'s version of the facts as credible. Having accepted J.G.W.'s testimony alone, any rational trier of fact could have found beyond a reasonable doubt that Defendant was guilty of the sexual offenses for which he was convicted. This conclusion is bolstered by the fact that J.G.W.'s testimony was corroborated to varying degrees by the testimony of Ms. Brashear, Mr. Mosely, and Detective James. Accordingly, we find that the evidence presented, when viewed in the light most favorable to the

22

State, was sufficient to sustain the jury's verdicts of guilty as to each of the three counts.

Defendant's argument in brief that J.G.W.'s use of the terms vagina, vaginal area, and butt fail to satisfy the elements of La.R.S. 14:43.1(A)(1), is not persuasive in the least. Vagina, vaginal area, and butt more than adequately describes and represent "anus or genitals" given the ordinary understanding of the words. Defendant's argument here would call into question countless similar convictions involving juvenile victims wherein descriptors such as "weenie," "booty," and "private" referring to genitals and buttocks are common. *State v. Redfearn*, 44,709, p. 7 (La.App. 2 Cir. 9/23/09), 22 So.3d 1078, 1085, *writ denied*, 09-2206 (La. 4/9/10), 31 So.3d 381. This court affirmed the conviction of the defendant for sexual battery in *State v. Lowe*, 08-669, p. 15 (La.App. 3 Cir. 12/10/08), 999 So.2d 194, 204, *writ denied*, 09-54 (La. 9/25/09), 18 So.3d 80, where a juvenile victim testified that he touched her "kitty," meaning her vagina, and in a taped interview, informed a detective that the defendant put his finger in her "cat."

*Filing or Maintaining False Public Records*

In his second assignment of error, Defendant asserts that the evidence introduced at trial, when viewed under the *Jackson* standard, was insufficient to prove beyond a reasonable doubt that he committed the offense of filing or maintaining false public records. In brief, Defendant argues that the evidence was insufficient to prove that he filed false records because the evidence offered at trial did not prove that the traffic tickets were false or that they contained fraudulent information of a material nature, and further that the evidence was insufficient to prove that Defendant filed them with Creola's town clerk. We disagree, finding that the evidence sufficiently proved all elements necessary for the conviction.

Filing or maintaining false public records, in violation of La.R.S. 14:133, is defined in relevant part as:

> A. Filing false public records is the filing or depositing for record in any public office or with any public official, or the maintaining as required by law, regulation, or rule, with knowledge of its falsity, of any of the following:
>
> (1) Any forged document.
>
> (2) Any wrongfully altered document.
>
> (3) Any document containing a false statement or false representation of a material fact.

"Whoever commits the crime of filing false public records shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars, or both." La.R.S. 14:133(C)(1).

The language in the third amended bill of information used the language in La.R.S. 14:133(A)(3), and the jury was instructed as such. The elements of the crime of filing or maintaining false public records are: "(1) the defendant files or deposits for record in any public office or with any public official, (2) with knowledge of its falsity, (3) any document containing a false statement or false representation of a material fact." *State v. Odom*, 07-516, p.5 (La.App. 1 Cir. 7/31/08), 993 So.2d 663, 667. "[Louisiana Revised Statutes] 14:133 does not require that the record filed be 'public' but that it must be filed or deposited, with knowledge of its falsity, 'in any public office or with any public officer.'" *State v. Morris*, 05-725, p. 7 (La.App. 3 Cir. 12/30/05), 918 So.2d 1107, 1111 (alteration in original) (quoting *State v. Salat*, 95-72, p. 5 (La.App. 1 Cir. 4/4/96), 672 So.2d 333, 337, *writ denied*, 96-1116 (La. 10/4/96), 679 So.2d 1378).

Pursuant to La.R.S. 32:398.1(A)(1), (2), "[a]ll traffic enforcement agencies in this state shall provide traffic citations in appropriate form containing notices to appear" on approved citation forms or by approved e-tickets. "The chief

24

administrative officer of each traffic-enforcement agency shall issue these books, maintain a record of each book and each citation contained therein . . . and shall require and retain a receipt for each book issued." La.R.S. 32:398.1(B). La.R.S. 32:398.2 (A) provides in pertinent part:

> Each traffic enforcement officer upon issuing a traffic citation to an alleged violator of any provision of the motor vehicle laws of this state or of any traffic ordinance of any city or town shall deposit the original citation or a copy of such traffic citation with a court having jurisdiction[.]

Louisiana Revised Statutes 32:398.4 provides in pertinent part:

> [When the citation] is sworn to and includes the necessary information required under the general laws of this state with respect to a complaint which charges commission of the offense alleged in the citation to have been committed, then such citation, when filed with a court of proper jurisdiction, shall be deemed to be a lawful complaint for the purpose of prosecution[.]

Where accusations in a traffic ticket are signed by the arresting or citing officer but are not signed under oath or sworn to, the ticket is not an affidavit and is insufficient to institute prosecution. *State v. Kimble*, 411 So.2d 430 (La.1982).

Here, Defendant pre-signed uniform traffic tickets as the complainant, where he himself did not witness any violation of the law. As the complainant, Defendant did not sign the citations before a notary or other public officer and knew such when he signed in advance. He did so knowing that the ticket forms would be used by J.G.W. to cite motorists, and in fact, she testified that he instructed her to do so. The jury heard her testimony, and based on its unanimous verdict, it believed her. The jury also heard the testimony of Mr. Mosely, who explained the legal necessity of the citation being signed under oath by the complainant. It is not for us to second guess that credibility determination, especially considering the corroborating evidence surrounding the issuance of the tickets.

As the Chief of CPD, Defendant knew that the signed tickets would be given to motorists, and that by law, the tickets would be filed for prosecution by Creola. La.R.S. 32:398.2(A). The fact that Defendant did not personally file the tickets once they had been written is of no legal consequence. *State v. Carpenter*, 00-436 (La.App. 3 Cir. 10/18/00), 772 So.2d 200, *writ denied*, 00-3152 (La. 1/25/02), 806 So.2d 665; and *State v. Bourgeois*, 13-606 (La. 12/6/13), 148 So.3d 561. The filing or maintaining of the citations that purport to be the basis for criminal misdemeanor violations, albeit traffic violations, "with knowledge of their falsity," meets the definition of La.R.S. 14:133(A)(2) and (3).

Further, Defendant argues that the fact that J.G.W. was utilizing the radar unit to issue the citations signed in advance by him was not prohibited, and there was testimony by Assistant Chief Mattix as to such. Defendant is incorrect. In order to utilize evidence of a radar reading to establish a violation of our speed laws, a proper foundation for the admission of the radar evidence must be established. *State v. Heck*, 486 So.2d 915 (La.App. 1 Cir.), *writ denied*, 488 So.2d 1024 (La.1986). The State must prove that the particular radar unit was functioning accurately and that the officer was properly qualified to operate the radar gun. As Chief of Police, Defendant knew, or should have known, that J.G.W.'s use of the radar unit to support the issuance of traffic citations was improper and that the citation was based on inadmissible evidence. Yet, he instructed her to do just that. "[I]gnorance of the law is not a defense to any criminal prosecution." *State v. West*, 33,133, p. 5 (La.App. 2 Cir. 3/1/00), 754 So.2d 408, 411. Accordingly, we affirm the conviction for filing false documents.

26

*Malfeasance in Office*

In assignment of error number three, Defendant asserts that the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he committed malfeasance in office. He argues, in brief, that the evidence concerning the tickets and the sexual battery evidence were insufficient for the malfeasance charge for the same reasons as the sufficiency review on the separate convictions. Further, he argues that even if the alleged misdemeanor battery on Ms. Brashear had been proven, it did not occur within the scope of his duty as chief of police, and thus, it was also insufficient to support the charge of malfeasance. Again, we disagree.

At the time of the commission of the offense,[13] La.R.S. 14:134(A) provided for the crime of malfeasance in office, as follows:

(1)    Intentionally refusing or failing to perform any duty lawfully required of him, as such officer or employee: or

(2)    Intentionally performing any such duty in an unlawful manner; or

(3)    Knowingly permit any other public officer or publicemployee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

"Any duty lawfully required of a public officer or public employee when delegated by him to another public officer or public employee shall be deemed to be a lawful duty of such public officer or employee[,]" and "[t]he delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty." La.R.S. 14:134(B). "Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars, or both." La.R.S. 14:134(C)(1).

---

[13]The offense date range was November 21, 2019, through March 30, 2020. The statute was amended in 2022.

27

In *State v. Thompson*, 15-886, p. 10 (La. 9/18/17), 233 So.3d 529, 537–38, the supreme court discussed the malfeasance in office statute as follows:

Under this statute, the state must prove the existence of a law or statute imposing an affirmative duty on the defendant as a public officer and that the defendant intentionally refused or failed to perform that duty or intentionally performed that duty in an unlawful manner. *State v. Davis*, 93-0599 (La. 4/11/94), 634 So.2d 1168, 1170. The duty must be one expressly imposed by law on the public officer because the officer is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will expose him to criminal charges. *State v. Perez*, 464 So.2d 737, 741 (La. 1985). Intent is likewise an essential element of the offense.

In *State v. Petitto*, 10-581, p. 13 (La. 3/15/11), 59 So.3d 1245, 1254, (emphasis in original) the supreme court discussed the element of intent as required for a conviction for malfeasance in office:

Louisiana R.S. 14:134 does not criminalize all ethical violations and/or general derelictions of duty. The object of the malfeasance statute is to punish a breach of duty committed with the required culpable state of mind. To this end, the statute expressly limits its application to instances in which a public officer or employee *intentionally* refuses or fails to perform or *intentionally* performs in an unlawful manner, any affirmative duty imposed by law upon him in his role as a public servant. The inclusion in the statute of a criminally culpable state of mind makes it clear that it applies only where the statutorily required *mens rea* is proven beyond a reasonable doubt. Thus, mere inadvertence or negligence, or even criminal negligence, will not support a violation of the malfeasance statute because the statute specifies the act or failure to act must be intentional.

Defendant was charged with malfeasance in office in the third amended bill of information as follows:

COUNT 5: 14:134 A MALFEASANCE IN OFFICE, in that Donald Alan Crooks, did on or about November 21, 2019, through March 30, 2020, being a public officer or public employee, did commit malfeasance in office by:

A.

(1) Intentionally refusing or failing to perform any duty lawfully required of him, as such officer or employee[;] or

(2) Intentionally performing any such duty in an unlawful manner; or

28

(3)     Knowingly permit any other public officer or publicemployee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

B.

Further, Donald Alan Crooks did commit the above-described malfeasance in office by:

   (1)     Pre-signing traffic complaint affidavits for the Town of Creola, State of Louisiana, and providing them to unqualified subordinate officers with no radar certification or post certification, thus allowing those subordinate officers to write complaint affidavits citations and falsely filing the citations as written by Chief Donald Alan Crooks even though Chief Donald Alan Crooks had not observed the started [sic] traffic infraction outlined in said affidavits.

   (2)     Committing multiple sexual batteries on a subordinate officer and another Town of Creola employee[,] while in uniform and performing his duties as Chief of Police for the Town of Creola.

The oath of office taken and signed by Defendant as Creola's Chief of Police on July 1, 2019, was introduced and was read into evidence by Mr. Mosely, during his direct examination. Therein, Defendant swore to "support the constitution and laws of the United States and the constitution and laws of this state" and to "faithfully and impartially discharge and perform all the duties incumbent" as the Creola Chief of Police according to the best of his ability and understanding. According to Mr. Mosley, Defendant had a duty as the chief of police to enforce the law.

In *State v. Coker*, 625 So.2d 190 (La.App. 3 Cir.), *writ denied*, 624 So.2d 1204 (La.1993), the defendant was also a Chief of Police charged with malfeasance in office for committing a battery on a criminal suspect being held for questioning. After his conviction, he appealed, arguing that:

[T]he state failed to prove the essential elements of the crime of malfeasance in that the state failed to show that defendant was in violation of 'a duty lawfully required of him' through: (1) the

29

introduction of a statute or provision of law which delineates an affirmative duty upon the official and (2) the showing that the duty was expressly imposed by law upon the official.'

*Id.* at 195.

Therein, this court rejected the defendant's argument that a particular statutory duty must be delineated and proven to apply to the public official in the performance of his or her duties.

> We conclude that Chief Coker failed to support the laws of the United States and of the State of Louisiana, as was required by his office. Chief Coker's reprehensible attack on these suspects constituted a breach of his most fundamental duty—the duty to respect the rule of law and to protect all citizens within his jurisdiction from violence against their persons. The defendant had an express, affirmative duty to investigate criminal activities and to apprehend suspects. The defendant performed those duties in an unlawful manner by maliciously battering two suspects.

> We reject the defendant's contention that affirming the trial court's finding will subject police officers to criminal malfeasance prosecutions for all violations of the law. Clearly, the malfeasance statute requires that the offender be acting in his official capacity and engaged in the performance of a duty which is required by law, in order to support conviction. The jurisprudence indicates that prosecution for malfeasance is reserved for those cases in which a public official has blatantly abused the authority of his office and violated the public trust by his direct, personal acts or failure to act.

> Without question, the defendant's unprovoked and unjustified attack on these two helpless suspects constituted one of the most flagrant abuses of police authority conceivable. The chief's conduct, in full view of his subordinates, demonstrated a fundamental disrespect for the constitutional rights enjoyed by our citizens, and set a potentially-dangerous and wholly unacceptable example to other department personnel.

*Id.* at 197–98.

Here, Defendant blatantly abused his authority as Chief of Police by subjecting his subordinate officer, J.G.W., to unwanted and unlawful sexual batteries on multiple occasions. The testimony of J.G.W. was clear that these incidents happened while Defendant was working and engaged in his position as Chief of Police. We have previously found the evidence of these offenses sufficient to

30

support his convictions for three counts of sexual battery and need not rehash that evidence here. He also engaged in an inappropriate and illegal sexual battery on the town clerk, Ms. Brashear. That evidence, as testified by Ms. Brashear, was one of the predicate offenses of malfeasance in office as charged in the bill of information. We find that this evidence, even considered alone, supports the sufficiency of the evidence for the conviction of malfeasance in office.

In addition, we have previously determined that the evidence is sufficient to support Defendant's conviction for the offense of filing or maintaining false public records. He did so by pre-signing traffic citations when he did not issue the same or witness any violation whatsoever, knowing that the citation would form the basis for a criminal charge or charges, albeit misdemeanor traffic violations, when used by J.G.W. To the overwhelming majority of citizens, a traffic citation is the closest any will come to the criminal justice system, yet Defendant chose to pervert the process, resulting in illegally charging these individuals. This too, was sufficient to support the conviction of malfeasance in office. Accordingly, Defendant's conviction on this charge is affirmed.

## DENIAL OF THE MOTION IN LIMINE

In his fifth assignment of error, Defendant asserts that the trial court committed manifest error in denying his motion in limine and permitting the State to offer testimony concerning another alleged improper touching, which, if proven, would have been a misdemeanor grade offense, as the alleged bad act was irrelevant and highly prejudicial to him. Here, Defendant points to the evidence of a sexual battery on Ms. Brashear, who testified at the trial as a witness to some of the events pertaining to J.G.W., and also testified to an incident that occurred when Defendant inappropriately touched her. He asserts that the trial court improperly admitted this evidence because: 1) the alleged battery was not relevant to the malfeasance charge;

31

2) the State failed to provide notice of its intent to use the evidence for an alleged other crime/bad act; 3) the trial court did not conduct a balancing test; and 4) the evidence was highly prejudicial because it bolstered the uncorroborated testimony of J.G.W.

> Evidence of other crimes is generally inadmissible in the guilt phase of a criminal trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met. *State v. Code*, 627 So.2d 1373 (La. 1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); *State v. Bourque*, 622 So.2d 198 (La. 1993); *State v. Silguero*, 608 So.2d 627 (La.1992). This general rule ensures that a defendant who has committed other crimes will not be convicted of a present offense simply because he is perceived as a "bad person," irrespective of the evidence of his guilt or innocence. A conviction should be based on guilt and not on character. *Bourque*, 622 So.2d at 233; *State v. Hamilton*, 478 So.2d 123 (La. 1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). One important safeguard is advance notice that such other crimes evidence will be offered. This prevents surprise and allows a defendant an opportunity to prepare a meaningful defense. *Bourque*, 622 So.2d at 233; *Hamilton*, 478 So.2d at 129; *State v. Prieur*, 277 So.2d 126 (La. 1973).

*State v. Johnson*, 94-1379, pp. 9–10 (La. 11/27/95), 664 So.2d 94, 99.

In *Johnson*, the supreme court considered the defendant's argument that the trial court erroneously allowed inadmissible other crimes evidence during his cross-examination when prosecutors asked him about prior guilty pleas to charges which were later subjected to a *nolle prosequi*. It found that the introduction of such evidence was erroneous as being beyond the scope of La.Code Evid. art. 609.1. However, the court held that the erroneous introduction of other crimes evidence is a trial error which may be quantitatively assessed in the context of the other evidence, and as such, may be reviewed for harmless error, regardless of La. Code Crim.P. art. 770, which provides for a mistrial "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to" "[a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not

admissible[.]" In so doing, the court abrogated the previous per se prejudicial analysis used to overturn convictions for the erroneous introduction of other crimes evidence, even where such evidence was not objected to, as had been espoused in cases such as *State v. Brown*, 428 So.2d 438 (La.1983); *State v. Duke*, 362 So.2d 559 (La.1978); and *State v. Hamilton*, 356 So.2d 1360 (La.1978). After reaching this conclusion, the supreme court reviewed the overwhelming evidence otherwise supporting the conviction and found the introduction of the evidence to be harmless.

Here, we find that the evidence as testified by Ms. Brashear was harmless beyond a reasonable doubt as to the convictions for sexual battery of J.G.W. The evidence as to the felony sexual batteries on J.G.W. was clear as to what occurred when, on the first occasion, Defendant grabbed her and touched her genitals through her clothing; on the second occasion, he grabbed her genitals with his hand and thrust his genitals to her buttocks; and on the final occasion, he grabbed her genitals directly, all without her consent. In fact, one or more of these incidents was witnessed by Ms. Brashear, and the evidence was corroborated by the testimony of Mr. Moore, Mr. Mosely, and Detective James.

In addition, Ms. Brashear's testimony as to the sexual battery perpetrated on her was independently admissible as part of the predicate offenses for the malfeasance charge as per the bill of information. While Defendant did file a motion in limine as to this predicate, he did not file a motion to sever the malfeasance offense from the sexual battery offenses.[14] Accordingly, we find no merit to this assignment of error.

---

[14] We address the claim of ineffective assistance of counsel for his failure to do so below.

33

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his sixth assignment of error, Defendant argues that he received ineffective assistance of counsel for (1) the failure to seek the severance of the three sexual battery counts from the count of filing false public records and the count of malfeasance in office and (2) the failure to file a motion to quash count five of the third amended bill of information.

In *State v. Christien*, 09-890, p. 7 (La.App. 3 Cir. 2/3/10), 29 So.3d 696, 701, this court set forth the following explanation for the handling of claims of ineffective assistance of counsel on appeal:

> A claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief because this allows the trial court to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains sufficient evidence to decide the issue, and the issue is raised by an assignment of error on appeal, it may be considered by the appellate court. *State v. Tapp*, 08–1262 (La.App. 3 Cir. 4/1/09), 8 So.3d 804; *See also State v. James*, 95–962 (La.App. 3 Cir. 2/14/96), 670 So.2d 461.

We find that the record here provides sufficient evidence for us to decide this issue and, we do so here.

To prove that his attorney was ineffective, a defendant must show his attorney was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

> Under the standard for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this Court in *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. The *Strickland* test of ineffective assistance affords a "highly deferential" standard of review to the actions of counsel to eliminate, as far as possible, "the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from

34

counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

*State v. Harris*, 18-1012, pp. 15–16 (La. 7/9/20), 340 So.3d 845, 856

The burden of proof in ineffective assistance of counsel claims falls upon the defendant. *State v. Griffin*, 02-1703 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, *writ denied*, 03-809 (La. 11/7/03), 857 So.2d 515.

> To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra*, 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. *State v. Sparrow*, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
>
> This Court has recognized that if an alleged error falls "within the ambit of trial strategy," it does not "establish ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks*, 505 So.2d 714, 724 (La.1987).

*Id.* at 40.

*Failure to File Motion to Sever*

Defendant claims that his counsel was ineffective for failing to file a motion to sever count four (filing false public records) and count five (malfeasance in office) from the three counts of sexual battery. In his brief, Defendant acknowledges the two-prong test for establishing a claim of ineffective assistance of counsel per *Strickland* and alleges his counsel's failure to file a motion to sever resulted in prejudice, as follows:

> In light of the trial court's ruling on the motion in limine discussed in the preceding assignment which permitted the testimony of H.N.B. to be presented to the jury, Donald Crooks was substantially prejudiced as it bolstered J.G.W.'s testimony. J.G.W. provided little information concerning when or how the alleged events occurred and there were no eyewitnesses to any of the events. Further, these alleged

35

events apparently occurred after J.G.W. was disciplined by Chief Crooks. Additionally, even though she had been advised that if she wanted to file charges against an elected official, she needed to contact the State Police, J.G.W. chose to contact the mayor, shortly after she had been laid off. She also spoke to the council in an attempt to be reinstated.

As a result, Defendant alleges he was prejudiced because "evidence tending to corroborate the uncorroborated testimony of J.G.W." was permitted. However, Defendant does not cite any applicable law or supporting jurisprudence to show counsel's performance was deficient. Notably, he does not reference La.Code Crim.P. art. 493, which provides:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

Defendant similarly does not mention La.Code Crim.P. art. 495.1, which permits a defendant properly charged with multiple offenses in the same bill of information to move for a severance "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." Defendant does not discuss the factors used in determining whether joinder of two or more offenses would result in prejudice, specifically:

> (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.

*State v. Lewis*, 97-2854, p. 15 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1015, *writ denied*, 99-2694 (La. 3/17/00), 756 So.2d 325.

36

It is a well-settled rule that mere conclusory statements are insufficient to establish a claim of ineffective assistance of counsel. *State v. Bell*, 21-599 (La.App. 5 Cir. 6/22/22), 343 So.3d 914, *writ denied*, 22-1179 (La. 9/27/22), 347 So.3d 155. In addition, Defendant fails to assert how the outcome of his trial would have been different if defense counsel had pursued the motion to sever. *Griffin*, 838 So.2d 34. Accordingly, we find that Defendant has failed to show that his counsel was deficient in failing to seek severance of the various charges or that he was prejudiced in any way. Defendant has failed to demonstrate that counsel's decision to proceed with one trial on all counts was not trial strategy. Thus, Defendant failed to meet his burden of proving that he received ineffective assistance of counsel.

*Failure to File Motion to Quash Count Five*

Defendant also claims that his counsel was ineffective for failing to file a motion to quash count five of the third amended bill of information. Similarly, his brief fails to address the applicable law and relevant jurisprudence in the discussion of this issue. Under Uniform Rules—Courts of Appeal, Rule 2–12.4(B)(4), all assignments of error must be briefed, and the appellate court may consider as abandoned any assignment of error that has not been briefed. *See State v. Vice*, 21-144 (La.App. 3 Cir. 10/6/21), 329 So.3d 398; *State v. Tranchant*, 10-459 (La.App. 5 Cir. 11/23/10), 54 So.3d 730, *writ denied*, 10-2821 (La. 4/29/11), 62 So.3d 108. In the present case, Defendant has presented no argument in support of his claim that counsel was ineffective in failing to file a motion to quash count five of the third amended bill of information. Therefore, considering Defendant's failure to present any argument in support of his claim, this court need not consider this issue. Uniform Rules—Courts of Appeal, Rule 2–12.4.

## EXCESSIVENESS OF THE SENTENCES FOR SEXUAL BATTERY

In his fourth assignment of error, Defendant claims that the sentences imposed on the three counts of sexual battery are violations of the Eighth Amendment of the Constitution of the United States and La. Const. Art. 1, § 20, as they are nothing more than cruel and unusual punishment. Specifically, he asserts that the sentences are excessive based on "the specific facts of this offender and these offenses" and that given his advanced age and health problems, home incarceration best serves both his and society's interests. Defendant asks this court to amend his hard labor sentences to place him on home incarceration.[15] This same argument was presented in his motion to reconsider sentence filed with the trial court, and therefore it is properly before this court. *See* La.Code Crim.P. art. 881.1.

This court, in *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43 (alteration in original), *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, set forth the following standard to be used in reviewing excessive sentence claims:

---

[15] Louisiana Code of Criminal Procedure Article 894.2(A) sets forth the requirements for home incarceration, as follows:

Notwithstanding any other provision of law to the contrary, a defendant may be placed on home incarceration under the following conditions:

(1) The defendant is eligible for probation or was convicted of a misdemeanor or a felony punishable with or without hard labor.

(2) In felony cases, either:

(a) The Department of Public Safety and Corrections, through the division of probation and parole, recommends home incarceration of the defendant and specific conditions of that home incarceration; or

(b) The district attorney recommends home incarceration.

(3) The court determines, after a contradictory hearing, that home incarceration of the defendant is more suitable than imprisonment or supervised probation without home incarceration and would serve the best interests of justice. The court may order home incarceration either in lieu of, or in addition to, a term of imprisonment. When the court sentences a defendant, it may order the defendant to serve any portion of the sentence under home incarceration.

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

In *State v. Soileau*, 13-770, 13-771, p. 5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06, *writ denied*, 14-452 (La. 9/26/14), 149 261, we further stated:

> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

>> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *and writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test from *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183.

Looking first to the nature of the offenses, Defendant was convicted of three counts of sexual battery, one count of filing false public records, and one count of malfeasance in office. In this appeal, Defendant only alleges that his sexual battery sentences are excessive. Sexual battery is enumerated as a crime of violence and carries a sentencing range of "imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than ten years." La.R.S. 14:2(B); La.R.S. 14:43.1(C)(1). For each of the three counts of sexual battery, the trial court sentenced Defendant to eighteen months at hard labor; however, the trial court ordered the sentences to run concurrently with one another. Therefore, Defendant's sentences fall in the lower end of the sentencing range.

As to the nature and background of the offender, Defendant was described as a seventy-one-year-old first felony offender at the time of sentencing. The presentence investigation (PSI) reflected, however, that Defendant had numerous arrests, which the trial court discussed in detail at sentencing:

> The Pre-sentence Investigation does reveal prior arrest[s]. There was a September 17, 1970 arrest for Trespassing on Government property and Theft of Gasoline. Uh, it appears Mr. Crooks . . . was sentenced to six (6) months probation.
>
> March 14th of 1973, Rapides Parish for Prowling. No disposition available. May 22nd, 1974 arrest by Rapides for Theft. No - - no disposition was available.
>
> January 13, 1975 arrest by Rapides Parish for Contributing to a Delinquency of a Juvenile[;] no disposition was available.
>
> July 26th of 1978, an arrest by Rapides for Non-Support of Child Support or Failure to Pay Child Support uh, it appears Mr. Crooks was ordered to pay one hundred dollars ($100.00) per month, and that his probation was terminated in October of 1981.
>
> November 27th of 1978, an arrest by West Monroe Police for Simple Trespass. Mr. Crooks was ordered to pay a fine of one hundred eighty dollars and fifty cents ($180.50) plus court cost[s].
>
> A January 12th of 1994 arrest by Grant Parish Sheriff's Office for False Impersonation. There was no disposition available.

40

April 23rd of 1996, an arrest by Rapides Parish Sheriff's Office for two (2) counts of Stalking[;] no disposition was available.

April 25th of 1996, an arrest by Rapides Parish for Harassing Telephone Language, two (2) counts, and a charge of Stalking. No disposition was available.

An October 16th, 1996 arrest by Grant Parish Sheriff's Office for Disturbing the Peace by Fistic Encounter[;] no disposition was available.

January 27th, 2014 arrest for Violation of Protective Order[;] here the charge was dismissed in February of 2014.

And a May 4th, 2020 arrest for the current charges.

In mitigation, defense counsel discussed Defendant's health problems and introduced two reports from the East Grant Health Center. According to defense counsel, after Defendant was convicted he suffered a significant stroke, which resulted in neurological issues and physical impairments. Additionally, Defendant has diabetes and high blood pressure, had undergone cervical and back surgeries, and suffered from a gunshot injury which caused damage to his back. Regarding his mental health, defense counsel stated that Defendant suffered from depression due to his poor health and the court proceedings.[16] Defense counsel requested that the trial court take Defendant's advanced age and health problems into consideration and order home incarceration as opposed to imprisonment. Several witnesses testified on behalf of Defendant, including his daughter, his brother, Mr. Mosley, and an alderwoman for Creola. Defendant declined to make any statements to the trial court.

Before imposing the sentences, the trial court discussed the mitigating and aggravating circumstances:

There was also a report that I reviewed . . . that [shows] Mr. Crooks suffers from reocu - - recurring depression, and that due to his

---

[16] In contrast, Defendant reported he had no history of mental health problems during the PSI.

41

mental condition that the incarceration was going to have a very negative effect on his um, mental health.

. . . I find that Mr. Crooks is seventy (70) years old. Um, there really is no dispute that Mr. Crooks is elderly, that he has significant medical conditions, many of which he's been dealing with for a long time. Some of which, apparently[,] he suffered while on the job working for law enforcement. And those are mitigating circumstances. Mr. Crooks' health is very relevant to the sentencing in this case.

There are also the aggravating circumstances. Chief Crooks was the Chief law enforcement officer for the Village of Creola, and according to the decision of the jury, he used that position to commit ... sexual battery, and also committed the [offense of] Injuring Public Records or Filing or Maintaining False Records as well as Malfeasance in Office.

I found it interesting [that] Mr. Dancer indicated that his brother was not guilty of the sexual battery, but kind of was guilty on the other two (2). I guess it's nice that Mr. Crooks has admitted that to him, he's never admitted it to any of you. Still hasn't admitted it today. He still has not admitted to any of you that he committed sexual battery.

[I find] it interesting that Mr. - - Ms. [J.G.W.] has indicated that she has forgiven the defendant, normally forgiveness is predicated on someone asking for forgiveness. Mr. Crooks has never asked for forgiveness. Never admitted he did anything wrong.

The trial court indicated that home incarceration was an option pursuant to La.Code Crim.P. art. 894.2 but sentenced Defendant to eighteen months at hard labor with the "recommendation that that be at a facility that can address [Defendant's] medical needs as well as his current mental health needs."

Regarding the imposition of hard labor sentences for sexual battery, appellate courts have upheld a range of sentences, although under varying circumstances. However, most of the reported cases deal with juvenile victims, and there appears to be none where home incarceration was imposed in lieu of imprisonment.

In *State v. Reynolds*, 41,612 (La.App. 2 Cir. 2/28/07), 954 So.2d 179, *writ denied*, 07-1023 (La. 11/16/07), 967 So.2d 522, the defendant was charged with forcible rape, pled guilty to sexual battery, and was sentenced to five years at hard labor without the benefit of parole, probation, or suspension of sentence. During

42

sentencing, the trial court noted the aggravating and mitigating circumstances, including the defendant's social history, his age, and his employer's testimony that he was a good employee. The trial court observed that the defendant was a first felony offender, though he had previously been charged with numerous misdemeanors. The second circuit found that the sentence was not excessive in light of the severity of the offense and in light of his reduced sentencing exposure effectuated by his plea.

In *State v. Dykes*, 38,092 (La.App. 2 Cir. 3/3/04), 867 So.2d 908, *writ denied*, 04-847 (La. 9/24/04), 882 So.2d 1169, the second circuit affirmed the maximum sentences of ten years at hard labor on each of three counts of sexual battery of a juvenile, even though the defendant was sixty-four years old and suffered from a disabling medical condition. Further, the trial court ordered count two to run consecutively with count one and count three to run concurrently with counts one and two. In finding that the sentences were not excessive, the second circuit noted that, "[t]he record more than adequately shows that the trial court was aware of the matters urged by the defense prior to imposing sentence, i.e., the defendant's age and disabling medical condition." *Id.* at 914.

In *State v. Redman*, 449 So.2d 636 (La.App. 1 Cir.), *writ denied*, 456 So.2d 170 (La.1984), the defendant was convicted of sexual battery and simple crime against nature, and the trial court sentenced him to consecutive terms of ten years at hard labor for the conviction of sexual battery and five years at hard labor for the conviction of crime against nature. On appeal, the first circuit found that the trial court considered the mitigating circumstances and found the sentences were not excessive:

> The mitigating factors that defendant argues the trial court failed to consider are that the victim accepted a ride home from work with defendant, and also, had several drinks with him. Additionally,

43

defendant contends that the sentence imposes excessive hardship and cruel and unusual punishment since the defendant at the time of sentencing was 68 years old. We disagree.

It is apparent that the court considered defendant's age, but his history of sexual offenses stretching over nearly half a century substantially outweighed any consideration defendant would be entitled to because of advanced age. Further, the trial court did not find that the victim facilitated the conduct by accepting a ride with and having a few drinks with defendant, and we agree. The trial court sufficiently articulated its reasons for this sentence and adequately considered the sentencing criteria. No abuse of discretion is presented.

*Id.* at 639.

Though the present case can be distinguished from *Reynolds*, *Dykes*, and *Redman*, these cases support the proposition that "[t]he trial judge is given great discretion in the imposition of sentences within statutory limits, and the sentence should not be set aside in the absence of abuse of his discretion." *State v. Bradley*, 414 So.2d 724, 725 (La.1982).

From the sentencing transcript, it is clear that the trial court considered the mitigating circumstances, including Defendant's advanced age and health problems, and whether home incarceration was appropriate, before imposing the sentences. Even considering his age and significant medical issues, the record supports the trial court's reasoning that a lesser sentence would deprecate the seriousness of the offenses due to Defendant's use of his position to perpetuate his sexual offenses and his lack of remorse. Though he argues on appeal that home incarceration is more suitable, the pertinent question is whether the trial court abused its broad sentencing discretion. *See State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957 (per curiam), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996). We find no abuse of that discretion. Consequently, we find that Defendant's hard labor sentences for his sexual battery convictions are not constitutionally excessive.

44

## DECREE

Defendant's convictions for three counts of sexual battery, malfeasance in office, and filing false public records are affirmed, as are the sentences for the sexual battery offenses. The sentences for malfeasance in office and for filing false public records are vacated, and the case is remanded for resentencing and a hearing to determine the appropriate amount of restitution, if any, in compliance with the provisions of La.Code Crim.P. art. 875.1.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED.**